The case for this week is Pankey v. Aetna Life Insurance Company and Mr. Swartwood. May it please the court, my name is Greg Swartwood. I'm here representing Mr. Pankey. This is an ERISA long-term disability case. What's unusual about this case, at least in my estimation, is that this is not a case about whether or not the claimant is disabled, at least not from a physical standpoint. Mr. Pankey is deaf. He's unable to perform his own occupation. Unable to perform any occupation is determined by the insurance company Aetna in this case. The issue is really whether or not Aetna properly, under the arbitrary and capricious standard of review, terminated his benefits via a letter dated July 15, 2022. That letter I think fails on two points, your honors. Number one, the letter indicates, appropriately so, that Mr. Pankey has failed to provide an attending physician statement from his doctor showing that he continues to be disabled and showing that he's under the regular care of a physician as required by the policy. It also indicates that he's failed to provide a disability questionnaire form and a 2020-2021 tax returns or K-1 statements. Now, the words that are used there is 2020-2021 tax returns slash K-1 schedules. Not sure whether that means and or or, but either way, that was the reason they were denying his benefits. They're required to tell him the claims regulation for ERISA cases. They are also required to tell him the plan provisions that they're relying upon in terminating his benefits. They did that in this case. They said, first of all, we're citing to the test of disability, which is merely the definition of disability in the policy. Secondly, they cited to the provision that allows them to terminate benefits. There's 13 bullet points there, but only four of those really apply. Three of the four of those apply to whether or not he's disabled. Clearly, the thrust of their termination letter is that they don't think that he's disabled and he hasn't provided the evidence. But under the plan, he was there and Aetna is permitted to ask for this information? They're certainly permitted to ask information. Is there is there a reason why? I mean, because it wasn't just this year, but it had been for multiple years. And then your client would at the last minute provide information. Is there a reason why Mr. Pinky is and was unwilling to furnish these materials? It's it's not in the record, your honors. OK, that's all I can say. If the insurance company is allowed to ask for the information, doesn't that suggest that they're allowed to get it? Or I mean, are they supposed to shout into the wind? And if he responds, then that's great for them. But if not, then they just have to assume that he qualifies. They can certainly ask for it, your honors and your honor. But but they they can't deny his claim based on evidence they're not entitled to. That kind of brings me to my next point here is that the so they they say we're denying your your claim because you haven't provided evidence to be able to show that you're disabled. And that's the thrust of the denial letter. Undoubtedly, there is this issue about attending physician statement, whether he's under the regular care of a physician and he provided that. That's not even an issue. The problem with the denial letters, it then says this is not a decision about whether or not you're disabled. And I think that's where the the rubber meets the road here. And this is the problem for Mr. Pankey. Mr. Pankey was not represented by counsel. He's a lay claimant. He's got to make a decision about, you know, what stuff are they asking me for and why are they asking me for this stuff? Well, I have a so I guess I'm trying to understand because I see two provisions really at play as you I think, as you said, you've got the one that determines whether or not you are disabled. And then there's one that determines how much money you're entitled to, even if you are disabled. So it could be that he was disabled, but the failure to provide evidence of income didn't establish that he also is entitled to benefit. So how are you kind of trying to disaggregate maybe those determinations? And I can get to that now if you want, Your Honor. But Judge Kidd, there was a report recommendation issued in this case, and Judge Kidd, I think, properly found that gets us over this, the original part of my argument. But Judge Kidd properly found, look, there's two provisions that apply here. Number one is. Yeah, but the order in front of us is the one that reverses Judge Kidd. So I would like you to address that one because that's the actual one before us, correct? That I'm going to continue on this path in your honor. So the denial letter, and this is not me saying this, is what is required by ERISA. You have to have a denial letter that can be understood by a claimant, not by an ERISA lawyer who understands these things. I readily admit, I know what they're talking about. What Aetna was saying is that we think you're physically disabled, but we're evaluating whether or not you're financially disabled from under that. I understand that, but Mr. Pankey can't understand that. As a matter of fact, we know he didn't understand it because he even cited to both of these sentences in his appeal letter, he said, look, on the one hand, and I'm adding in the word on the one hand, but he said he cites to the provision that says we're denying your claim because you failed to provide these documents. And then he also cites to the sentence that says, and this is not a decision about whether or not you're disabled. He then went on to provide what he thought would be sufficient evidence to be able to show that he continued to get benefits. But I think the way that the word is, the letter is written, Mr. Pankey was, you know, did his best as a claimant to be able to provide the information, and obviously he failed because Aetna terminated his benefits and said that wasn't sufficient. But he did provide, as part of this appeal, an attending physician statement, which was current. He provided a claimant's questionnaire, although that was one that he provided in the past. It was two or three years old. And then he provided Social Security Administration records showing that he didn't have any income. And he pointed out, by the way, if I had income, even if it's self-income, it's going to be on these records. And that's what they were looking for. They were looking to see whether he had any income, whether he was working. Second part of this, kind of the same argument, is when you go through the record, you see that primarily what Aetna was looking for was information from this LLC, this real estate LLC that he had around little development. And he was a member of that. Apparently, it held a piece of real estate, and it was an investment vehicle. And that's, there's no dispute, that's what was in the record. But our position is, is that in order to terminate benefits based on the test of disability, you have to be working. It's not just investment. So he can get as much money as he wants. He can have money in 401ks, he can have money in stocks, he can have money in bonds, he can do any investment he wants. Right, that's why they were looking for his tax returns, right? Which would show income and show where it came from, right? That's correct. And he did provide his Social Security record, which I think showed the exact same thing. But they were asking for his tax returns, right? They were not, well, they were asking, which I think was improper, for, in part, his personal tax returns. I have to go back and agree with what Judge Kidd had said in the report recommendation. But, which is true, and there's no doubt about this, he never provided his personal tax returns in the 10 years that he received benefits. So they had asked for personal tax returns. He never provided his personal tax returns. He didn't provide those, which is in the allowed his private information to get into other hands, I think part of another claim file. So he was concerned about that. He never provided his personal tax returns. But you're correct to your point, what they were asking for, primarily, I think, were the K1 statements from this business, Brown Little Development. He had provided those in the past. He provided tax returns for them for several years and then went to just providing the K1 statements. It's true, he did not provide those as part of this. Instead, he provided his Social Security record. You stated earlier, though, that he was confused, perhaps, as to what the letters were requiring. But you just acknowledged that he did provide something that he thought would be sufficient to satisfy his income. So, I mean, is it one or the other? We can say he was confused, but he complied. I think the letter is confusing, and I think he did his best to comply. That's what I agree with. Is it fair to say he did his best to comply when Aetna's internal records showed that he was non-compliant and defensive about his claim? I mean, you may have other arguments, but I don't know that there's evidence in the record that he, quote-unquote, did his best. Well, all I can do is, you know, these cases, there's no discovery, so nobody's to pose, Mr. Panicky, I don't know what his thoughts are. All I'm doing is reading what he said in his letter, and I do know for sure that in his appeal letter, he cites to both of those provisions. He doesn't say, I'm confused, admittedly. He doesn't say I'm confused. Right, so how can we conclude that he was confused? What evidence do we have that he was confused? Well, I think the letter is confusing in and of itself. I mean, the question is whether or not this decision, the decision, so the July 15, 2022 letter, whether that decision is arbitrary and capricious. I mean, that's the issue in the case. And I think when you tell Mr. Panicky, on the one hand, we need this stuff so we can investigate whether you're disabled, and on the other hand, we're not making a decision about whether or not you're disabled. Well, he, right, so he, under the plan to receive benefits, you have to be disabled, and you have to have an income below a certain threshold. Correct. And he says that he understood that the question was about his income, right? No, I'm saying I thought that 100%. I don't think he understood that. Why? He submitted, it looks like more documents related to his disability, but the company asked him for three documents to prove his continued eligibility, right? Yes, your honor. Attending physician statement, completed claimant questionnaire form, and his 2020 and 2021 tax statements. And did Mr. Pankey submit those? He provided the, he didn't provide tax statements, no. Okay, so no. So the, and Aetna had given him, it always erred on the side of providing him benefits, right? It gave him over a year to respond to those requests. I would like for my insurance company to be quite that generous, right? More than a year. And when it, even after it terminated his benefits, it him another chance to provide additional information that would change the decision, right? That's correct, your honor. So how, and then even after that, it notified him two more times that he needed to provide income proof, and he still didn't do that either, right? That's correct, your honor. I mean, at what point can the insurance company give up? Well, they could certainly give up if these were things that were legitimately being asked for, but my point is, is that you can't terminate somebody's benefits if on the one hand you're saying we're terminating it because you're, because we're not terminating it because you're disabled, because we think you're disabled, and at the same time you're asking them for documents to prove that he's disabled. But real quickly, getting back to this Brown level development, they, I don't think they can terminate his benefits based on the failure to provide that document, to your point exactly, because that's passive income. In order to terminate his benefits based on his failure, based on him not being disabled, he has to be performing work. Investment income is not work. Passive income is not work. Now, admittedly, this issue was never addressed in the file. What was happening was the insurance company was getting the documents, the documents all showed a loss each time, so there was no reason for them to evaluate it. But at some point they were going to have to evaluate whether or not his investment income from Brown level development was something they could even terminate his benefits for anyways. Can you say it showed a loss anyway? Didn't you just say it showed a loss anyway? Yes, each statement, so he sent statements from 2011 to 2019. All of those showed a loss. Right, so how, why would it remotely be an issue that perhaps his, perhaps they concluded that his income from that was too high when they couldn't possibly have concluded that? They didn't, they never made that decision, your honor. Well, right, so why, why would we get into the question of whether you have to show that you're too high income was from work or investments when he didn't even show that his, he didn't show anything about making income? My point is, is you can't terminate somebody's benefits for failing to provide a document that is irrelevant to the issue you're addressing. So you're saying that his documents, his tax returns, which would have shown his income are irrelevant to determining whether he had income? Is the K-1 statement from Brown level development. I got to parse that out from, from personal tax returns. Okay, well we've taken over your time. Thank you. Ms. Jones, whenever you are ready. Good morning. Amy Wessel-Jones on behalf of the Epeli Aetna Life Insurance Company. May it please the court. The issue before the court is simply whether there's any reasonable basis in this record for the claim administrator's decision to terminate benefits after the various documents that the claim administrator had requested seven times over a period of nearly two years were not provided. Those included not only the tax returns in the schedule K-1s, but also a claimant questionnaire on which Mr. Pankey was required to disclose whether he, at any time during, since the onset of his disability, had engaged in any work activity including self-employment and whether he was planning to do so in the future, among other questions. Instead of submitting that updated claimant questionnaire, he submitted a questionnaire that he had filled out in 2018, five years earlier, did not provide an updated questionnaire, despite three subsequent requests for that. So, importantly, the policy at issue includes a discretionary clause that gives our client discretion to not only determine eligibility for benefits, but also adopts reasonable interpretations of the policy to promote orderly and efficient administration. Yes, and two of the provisions that I mentioned earlier, one is clear in terms of termination, but the other one speaks to suspension or other acts. So, if indeed he presented evidence that he was disabled physically, but not enough information regarding his income, why doesn't that result in suspension as opposed to outright termination? Yes, because so in the letters at issue that were sent between June 2021 through July 2022, the claim administrator had asked for these documents and clearly stated in these letters that they were seeking them for purposes of determining whether he still met the test of disability, which includes that financial component that he's earning less than 60% of his predisability earnings. Now, the termination provision itself, which is at page 3408 of the administrative record, states they can terminate benefits as of the date you fail to provide proof that you meet the long-term test of disability. So, the issue becomes, what does the word proof mean? Does it mean proof that we request or does it mean any proof that you're willing to provide us? And in this case, Mr. Pinky has taken the position that because he submitted some proof in terms of a Social Security earnings record in lieu of all of the records that we had requested, that that was sufficient to avoid termination and only should have resulted in suspension of benefits. And why, I'm sorry, why was that not sufficient, the Social Security earnings record? The earnings record is a relatively bare-bones record that it simply states what the taxable income is for Social Security and Medicare purposes and it even has warnings on that statement that please review this to ensure that it's accurate. If you see any errors, please contact us because, as Mr. Pinky noted in his appeal letter, the way that that document is created is essentially the IRS, if there's a Schedule SE filed for self-employment, the IRS has to report that information to the Social Security Administration and then the Social Security Administration in turn creates that record. So, in the past, there had not been a single year when the SSA earnings record was the only document that Mr. Pinky had provided. He had always provided either the Brown Little Development tax returns, the K-1s, and in other years he also provided income questionnaires and the long-term disability employee questionnaire on which he had to certify that he was not working. So, this time around was different. He simply would not provide any of the additional documents that were requested and, as Judge Grant noted, the tax return is far more detailed than the Social Security earnings record. I just wanted to briefly touch on some points that Mr. Swartwood mentioned about the confusing, the allegedly confusing nature of the termination letter. I would point the court to the appeal letter that Mr. Pinky sent. It's at pages 966 through 967 of the administrative record, which shows that he very clearly understood exactly what was being requested of him. He understood that this termination was a proof of loss termination and he has an entire section with a heading entitled proof of loss in that appeal letter where he essentially explains this is why I think you should accept my Social Security records in lieu of the records that you've requested. But notably in that letter, he doesn't state that Brown Little Development is a passive real estate investment. Instead, he cites, he attaches, he doesn't even address it in the body of the letter, but he attaches as an exhibit a March 2015 letter where he had stated at that time it was a passive real estate investment. So, I would submit that it was absolutely reasonable for the claim administrator in this instance when we now have, we simply want current documents saying what is your income from this Brown Little Development, whether that's an investment or whether it's an actual business activity in which you're materially participating, then that means that he's working. And if he is working, then that would create a whole other inquiry in terms of whether he's still disabled under the meaning of the policy. So, yes, I would submit there's no confusion there in terms of the letter itself and that it did comply with all the regulations that he's mentioned. Now, I would submit there's some pretty far-reaching policy implications of Mr. Pankey's desired ruling. For instance, his position is essentially that if he had been granted some leniency in the past by not being required to submit personal tax returns in years when he had either provided these Brown Little Development tax returns or these Schedule K-1s and that had been accepted, that somehow that essentially results in a waiver of the claim administrator's right to seek those personal tax returns in the future. And I would submit that's just not simply a workable result, right? I mean, that sends a message to these claim administrators that they have very limited flexibility in how they administer claims, that if the circumstances change over the years and you have a claimant who was willing to provide documents in the past and now all of a sudden is not providing them, that you don't have the right to respond to that by insisting that perhaps a personal tax return that he had gotten away with in the past not providing, it needs to be provided now. But it also sends a message to claim administrators that you have to be very strict from the very beginning of the claim administration and basically demands that you receive every single document that you're entitled to from the outset, because if you don't, it can come back to bite you later. And I don't... Arbitrary and capricious, right? I mean, what is the consistency that is required to avoid that type of finding? I would submit the decision here is not arbitrary and capricious. There was some case law cited by Mr. Pankey that talks about how past interpretations, or if you have not interpreted the policy uniformly in the instant termination, that that's one factor that's relevant to whether a decision is arbitrary and capricious. But here, that argument almost incorrectly assumes that the factual circumstances here are the same as they were in the past, and now all of a sudden we're treating it differently when that's not at all the case. Here, he will not provide, in the relevant time period of 2021 to 2022, he's now refusing to provide the K-1s, and he refuses to submit an updated claimant questionnaire on which he has to certify whether he's working currently or planning to do so, and he has to sign that document certifying that all the statements are true and complete. So it's not an apples-to-apples comparison, and I would submit that there's simply not a lack of uniformity here. So unless there are any other questions from the court, I will cede my time. Thank you. Thank you. Mr. Swartwood, you've got two minutes. I just want to be clear on the definition, because it sounds like the insurance company is saying disabled is not limited to just your physical capacity, but includes your financial needs. But it sounds like your argument has been, no, disability means physical, how much money you need is in terms of the benefit. No, I agree, Your Honor, that what you're saying, they're saying, that's what I'm saying too. Disability includes a physical component, he's deaf, and a financial component. He has to be unable to work in any occupation and be able to earn at least 60 percent of his predisability earnings. So both of those things are part of the definition of disability. I do want to point out one thing that she said, which is, I think, inaccurate based on the record. Aetna did, in fact, pay him disability benefits when he only provided a Social Security statement in the past. So I'm looking at, on page 10 of my brief, it's the facts right out of the record. Aetna requested a 2015 tax return, September 28th of 2016. They did it again in January 26th of 2017. Again, February 28th of 2017. On February 16th, so before he received the third letter, Mr. Pankey, via letter dated February 16th of 2017, provided only his Social Security record. And then Aetna, in a claim note, and this wasn't a denial, this was an ongoing claim note, but Aetna, in a claim note, at the appendix 378, approved his claim based on just the Social Security record through June 30th of 2018. So for the next year, basically, they approved it based on him providing the Social Security record, which is the same thing that he tried to send to them this time during this administrative appeal. There's nothing to prevent them from requiring more information. I mean, the fact that they are perhaps deviating from that pattern in practice doesn't equate to arbitrary and capricious behavior, does it? No, I would agree with that, Your Honor. And last point, real quick, I do want to refocus you back on, there is the second provision in the policy that says, that's a more specific provision, that if you haven't provided the income information that Aetna is requesting, then you suspend or reduce benefits you don't terminate. Thank you, Your Honor. Thank you. We appreciate counsel's argument in this and the other cases, and the court is adjourned.